# EXHIBIT A

| 18th JUDICIAL DISTRICT COURT<br>ARAPAHOE COUNTY, COLORADO<br><br>Court Address: 7325 S. Potomac Street<br>Centennial, Colorado 80112<br>Court Tel. No.: (303) 645-6600 | DATE FILED<br>January 17, 2025 5:19 PM<br>FILING ID: 154DA92DFD91B<br>CASE NUMBER: 2025CV30147 |
|---|---|
| Plaintiffs: **GIRMA YILMA**, on behalf of himself and all others similarly situated,<br><br>**v.**<br><br>Defendants:<br>**ATHENA BITCOIN, INC.**<br>℅ Incorp. Services, Inc., Registered Agent<br>131 Continental Drive, Suite 301<br>Newark, DE 19713<br><br>**FOXFIELD WINE & SPIRITS, LLC**<br>℅ Ragu Dhaurali, Registered Agent<br>16350 E Arapahoe Rd Unit 102<br>Aurora, CO, 80016<br><br>**BIG D OIL CO.**<br>℅ Gunderson Palmer Registered Agents LLC, Registered Agent<br>PO BOX 8045<br>Rapid City, SD 57709 | ▲ COURT USE ONLY ▲ |
| **Counsel for Plaintiffs:**<br>Allen R. Jones III (CO #59350)<br>Resolve Law Group<br>885 Arapahoe Ave.<br>Boulder, CO 80302<br>(720) 800-8338<br>allen@resolvelawgroup.com<br><br>Brian D. Flick (OH #0081605)*<br>Marita I. Ramirez (OH #0101882)*<br>DannLaw<br>15000 Madison Avenue<br>Lakewood, OH 44107<br>(216) 373-0539<br>(216) 373-0536 e-fax<br>notices@dannlaw.com<br>* PHV Anticipated | Case Number:<br><br>Div.:    Ctrm: |



**CLASS ACTION COMPLAINT AND JURY DEMAND**

Plaintiff, Girma Yilma, and for his Class Action Complaint for Damages against Defendants, Athena Bitcoin, Inc., Foxfield Wine & Spirits, LLC, and Big D Oil Co., and hereby states as follows:

## INTRODUCTION

1.      The Plaintiff, Girma Yilma ("Plaintiff"), is a 69 year-old retiree from Aurora, Colorado, who between November 28, 2024 and December 3, 2024, fell victim to an elaborate scam in which he was directed to deposit $45,800.00 from his checking accounts into two separate Athena Bitcoin ATM kiosks located inside Foxfield Wine and Spirits on Arapahoe Road, and Big D on N. Colorado Blvd., by an individual impersonating a Wells Fargo Bank representative. The unknown scammer convinced Plaintiff that he needed to make the deposits to secure his bank accounts due to the fact that his computer was hacked.

2.      The use of Bitcoin ATMs to facilitate such crimes, known as "impersonation scams" has "skyrocketed" in recent years, according to a recent Federal Trade Commission (FTC) report, "increasing nearly tenfold from 2020 to 2023," with reported cases "overwhelmingly about government impersonation, business impersonation, and tech support scams," and with "more than two of every three dollars reported lost to fraud using these machines… lost by an older adult."[1]

---

[1] https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2024/09/bitcoin-atms-payment-portal-scammers (last visited Dec. 20, 2024)

3.      The Consumer Financial Protection Bureau reported in February 2019 that an estimated $2.9 billion to $36.5 billion is lost every year to financial exploitation of older adults.[2] The Bureau reported that "Since 2013, financial institutions have reported to the federal government over 180,000 suspicious activities targeting older adults, involving a total of more than $6 billion. These reports indicate that financial exploitation of older adults by scammers, family members, caregivers, and others is widespread in the United States." *Id.*

4.      Elder financial scams involving cryptocurrency take a number of forms.[3] One such scam, pertinent to this case, involves a scammer impersonating the victim's bank, the government, a utility company, or relative via the telephone. The scammer convinces the victim of an artificial problem requiring urgent action, and further convinces the victim that the only way to resolve the problem is to deposit cash into a cryptocurrency ATM, which converts the victim's U.S. Dollars into untraceable cryptocurrency, and to transfer the Bitcoin to a "secure" Bitcoin wallet. *Id.* The scammer then sends the user a QR code and instructs the user to hold the QR code up to the ATM camera, but the QR code is embedded with the scammer's Bitcoin wallet address, and so the Bitcoin is deposited directly into the scammer's online Bitcoin wallet. *Id.*

5.      Defendant, Athena Bitcoin, Inc. ("Athena"), itself has acknowledged on its website that its Bitcoin ATMs have been foreseeably and regularly used for impersonation scams. Despite having knowledge that its ATMs are exploited by criminals to facilitate illegal activity, Athena has failed to implement policies and operational safeguards to prevent its Bitcoin ATMs from

---

[2] Consumer Financial Protection Bureau, Suspicious Activity Reports on Elder Financial Exploitation: Issues and Trends (Feb. 2019) https://files.consumerfinance.gov/f/documents/cfpb_suspicious-activity-reports-elder-financial-exploitation_report.pdf(consumerfinance.gov). (last visited Dec. 20, 2024).
[3] Federal Trade Commission, Reports show scammers cashing in on crypto craze (June 3, 2022) https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2022/06/reports-show-scammers-cashing-crypto-craze. (last visited Dec. 20, 2024)

continuing to serve as instrumentalities for these crimes. Instead Athena limits its "efforts" to providing warnings about the scams on Bitcoin ATM screens and its website, which Athena knows is ineffective at preventing the explosion of use of its Bitcoin ATMs to steal money from seniors and other vulnerable victims.

6. By recognizing the prevalence and severity of elder financial scams involving cryptocurrency and Athena Bitcoin ATMs, and by holding itself out to the public and its customers that it "ensures safe and secure banking [...]", Defendants assumed a duty to ensure that its efforts to prevent, intercept, and mitigate elder financial abuse through its ATMs were reasonable.

7. However, Athena makes no meaningful effort to intervene in such scams. In fact, Athena has not only failed to make any real effort to detect and stop impersonation scams using its Bitcoin ATMs, but when the crimes have predictably and repeatedly occurred, Athena has retained possession of the stolen cash harvested from its machines rather than returning it to the victims, based on the misrepresentation that the cash had been "irreversibly" exchanged for Bitcoin and transferred the scammers' untraceable wallet.

8. Athena's misrepresentation that the stolen cash was "irreversibly transferred" is particularly apparent with respect to the substantial portion of the stolen cash retained by Athena as a fee for its "services" and thus necessarily not transferred to the scammer.

9. Athena partners with gas stations, convenience stores, vape shops, and similar establishments who collect a substantial revenue from their relationship with Athena by housing Athena Bitcoin ATMs.

10. The Defendants are capable of implementing effective and sufficient checks and procedures both at the Bitcoin ATMs and internally that would intervene, prevent, mitigate, or deter the use of its ATMs in scams such as the one in this case, but knowingly choose not to adopt

effective checks or balances because doing so would thwart a substantial volume of their business and the profits gained from every dollar inserted into its ATM.

6.    The results are devastating. Due to the Defendants' negligent, reckless, and knowing failure and refusal to implement appropriate and sufficient checks and procedures to prevent, intervene, mitigate, or deter the use of the BTMs in fraudulent activity, the Plaintiff lost thousands of dollars or more in just mere minutes.

7.    The Court should enjoin Defendants from engaging in illegal and deceptive conduct, and should award restitution, damages, penalties, and other relief as appropriate.

## PARTIES

8.    Plaintiff, Girma Yilma ("Plaintiff"), is a natural person who resides in Aurora, Colorado and has resided at this location for all relevant times herein.

9.    Defendant, Athena Bitcoin, Inc. ("Athena") is a Delaware corporation with its principal place of business in Illinois. It is among the largest operators of "Bitcoin ATM" cryptocurrency kiosks in the United States, with approximately 799 Bitcoin ATMs in Texas.

10.    Athena is a Money Services Business and is registered with the United States Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN"), pursuant to 31 C.F.R. Ch. X, Part 1022.

11.    Defendant, Foxfield Wine & Spirits, LLC ("Foxfield"), is a liquor store located at 16350 E Arapahoe Rd., Aurora, CO, 80016 that has partnered with Athena by permitting Athena to install and maintain its Bitcoin ATMs inside the store.

12.    Defendant, Big D Oil Corporation ("Big D"), is a convenience store located at 3400 N Colorado Blvd., Denver, CO 80205 that has partnered with Athena by permitting Athena to install and maintain its Bitcoin ATMs inside the store.

13.     Defendants conduct substantial business in and directed towards Colorado,
including but not limited to: (i) purposefully placing, operating, maintaining, and deriving
substantial revenues from 48 separate Athena BTMs in the State of Colorado, including the
Athena BTMs at issue in this case; (ii) advertising its Athena BTMs to residents of Colorado;
and (iii) conducting business with and deriving revenue from residents of Colorado who use its
Athena BTMs, including Plaintiff.

## JURISDICTION AND VENUE

14.     Venue is proper in this Court pursuant to Col. R. Civ. P. 98(c)(1) as the Defendant
conducts business in Arapahoe County.

## FACTUAL ALLEGATIONS

### Bitcoin ATMs

15.     Bitcoin (BTC) is a virtual currency (cryptocurrency) that is transferred directly to
a recipient online without the need for a bank, broker, or payment processor. BTC transactions
are recorded on a blockchain or public ledger.

16.     Bitcoin ATMs are publicly accessible kiosks for converting cash to BTC
cryptocurrency, which is credited to an untraceable online account called a "wallet." The kiosks
resemble ordinary ATMs and typically feature a touchscreen for display and input of
information, a bill acceptor slot, and a scanning device for the user to input a QR code associated
with the "wallet."

17.     The number of Bitcoin ATMs available for public use has increased dramatically
in recent years, with the machines typically located at gas stations, convenience stores, vape
shops, and similar establishments.

18.     Bitcoin ATM operators, including Athena, have designed and marketed transactions at their kiosks to be immediate, untraceable, and irreversible and charge much higher fees than traditional online Bitcoin exchange services.

19.     Because of their ubiquity and obvious suitability for illicit cash transfers, Bitcoin ATMs have become the instrumentality of choice for perpetrators of "impersonation scams," in which organized, sophisticated criminals pose as government, law enforcement, corporate technical support personnel and similar authority figures, and convince their victims (in most cases, seniors with retirement assets, like the Plaintiff) to withdraw large amounts of cash from their bank accounts and deposit it into specified Bitcoin ATMs using a provided QR code, typically to prevent some legal or financial calamity concocted by the scammer.

20.     The alarming explosion in the use of Bitcoin ATMs to facilitate such scams against seniors and other vulnerable groups has been the subject of numerous, well-publicized reports by federal and state financial and law enforcement agencies over the past several years. Most recently, the FTC issued a data report in September of 2024 stating that "data show that fraud losses at BTMs are skyrocketing, increasing nearly tenfold from 2020 to 2023," that "[r]eports of losses using BTMs are overwhelmingly about government impersonation, business impersonation, and tech support scams," and that "people 60 and over were more than three times as likely as younger adults to report a loss using a BTM. In fact, more than two of every three dollars reported lost to fraud using these machines was lost by an older adult."[4]

### Athena Bitcoin

21.     Athena is engaged in the business of placing and remotely operating cryptocurrency ATMs through which they sell fractional shares of the cryptocurrency Bitcoin.

---

[4] https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2024/09/bitcoin-atms-payment-portal-scammers (last visited Dec. 20, 2024)

22.     As of February 10, 2024, Athena operates nearly 3,000 Bitcoin ATMs in the US,

El Salvador, Colombia, Argentina and Mexico, including 48 Bitcoin ATMs in the state of

Colorado.[5]

23.     Athena charges a fee per BTC equal to the prevailing price at U.S. crypto-based

exchanges plus a substantial markup. *Id.* Athena's revenue associated with its Bitcoin ATM

transactions are recognized when the crypto asset is delivered to the customer. *Id.*

24.     Each of Athena's Bitcoin ATMs is connected to the Internet and employs its own

developed software, Exodus, to manage and administer the ATMs.

### Athena is expressly aware that its Bitcoin ATMs **are commonly used to perpetuate the bitcoin scams, fraud, money laundering, and to pay for illegal goods and services.**

25.     Athena has openly acknowledged since at least 2018 that its Bitcoin ATM kiosks

not only pose a high risk of use as instrumentalities for impersonation scams, but in fact have

been regularly used for such crimes.

26.     For example, on its website, Athena published a blog titled "Avoid these Bitcoin

Scams." In this blog, Athena expressly recognized that, "[s]cammers are looking to say and do

anything to convince you of an urgent need to pay through Bitcoin, and they will often

"helpfully" point out nearby ATMs where you can follow their commands."[6]

27.     Athena further recognized in the same publication that it "[...] receives numerous

reports of fraud per month, so we want to share much of what we've learned to look out for when

it comes to Bitcoin, digital currency, and physical cash kiosks."[7]

28.     By recognizing the prevalence and severity of financial scams involving

cryptocurrency and its Bitcoin ATMs, and by holding itself out to the public and its customers

---

[5] https://athenabitcoin.com/the-company/ (last visited Dec. 20, 2024)
[6] https://athenabitcoin.com/avoid-these-bitcoin-scams/ (last visited Dec. 20, 2024).
[7] *Id.*

that it "ensures safe and secure banking [...]", Athena assumed a duty to ensure that its efforts to

prevent, intercept, and mitigate financial abuse through its Bitcoin ATMs were reasonable.

29.    Further illustrating this point, Athena received a complaint directly from a

consumer in May 2024, that they had been victimized by a scam utilizing an Athena Bitcoin

ATM[8]:

> May 8, 2024 - On 04/15/2024, I was contacted by someone who had access to all
> my personal identifying information. These individuals also had information on
> my live online banking transactions and reported I was being scammed by *****.
> I was advised to pull my money out the bank and deposit it in an ****** Bitcoin
> machine at the location in this gas station. After depositing the money it was
> obvious it was a scam as I could no longer access it and the numbers listed
> wouldnt give me any information on how to access the money. Spoke to the
> owner and they refused to give information on who put the *** there to myself
> and Police. They had conflicting stories and the police confiscated the *** in
> belief my $20,000 was still there. The owner did report he received 20%
> commission of whatever the machine makes. The concerns are they know this is a
> scam and has it in the stores with no trail of owns it. They reports its serviced
> sporadically or when a deposit is made which is a red flag. The owners
> involvement is being investigated and its believed Marathon should be held
> responsible for their involvement. They should be pushed to safe guard their
> customers against fraud and not allow it in their store. Looking for $20,000 to be
> giving back to me. The number provided by the atm machine is **************
> and theyre not providing any information.

30.    Athena receives complaints directly from consumers through the Better Business

Bureau[9] and the Consumer Financial Protection Bureau (CFPB) that its Bitcoin ATM users are

being victimized by scams utilizing Athena's ATMs. In fact, as recently as September 11, 2024,

the Senate Committee on the Judiciary issued a letter to Athena to "take immediate action to

---

[8]https://www.bbb.org/us/il/chicago/profile/banking-services/athena-bitcoin-inc-0654-
1000100837 (last visited Dec. 20, 2024).
[9] https://www.bbb.org/us/il/chicago/profile/banking-services/athena-bitcoin-inc-0654-
1000100837 (last visited Dec. 20, 2024).

address troubling reports that your Bitcoin ATMs (BTMs) are contributing to widespread

financial fraud against elderly Americans."[10]

31.    The FTC reported that between January 2021 and June 2022, more than 46,000

persons reported they had been victims of cryptocurrency scams, amounting to losses of more

than $1 billion, the reported median loss of which was $2,600.[11]

32.    In 2023, the Federal Bureau of Investigation (FBI) received more than 5,500

complaints regarding crypto kiosks being used for fraudulent activity with losses over $189

million. Americans over 60 years old filed the vast majority of complaints and suffered the vast

majority of losses. And this data from the FTC and FBI likely under-report the true extent of the

scams and fraud associated with Bitcoin ATMs.

33.    Despite knowing for over six years that its Bitcoin ATM kiosks have regularly

and foreseeably been used by criminals as instrumentalities in impersonation scams, Athena has

failed to remediate the extreme danger that its Bitcoin ATMs have posed to seniors and other

vulnerable populations.

**Defendants derive a substantial income from use of Athena ATMs in fraudulent scams,
money laundering schemes, the sale of illegal goods and services, and other crimes, and
therefore intentionally takes less-than-sufficient steps to intervene, prevent, or mitigate
against these
transactions.**

34.    Despite its express knowledge of the regular and foreseeable use of its Bitcoin

ATM kiosks as instrumentalities in impersonation scams, Athena has failed to implement design,

operational, or policy changes that would preclude such use, for example, by detecting and

---

10

j/https://www.judiciary.senate.gov/imo/media/doc/2024.9.11_Letter%20re%20Bitcoin%20ATM
%20Fraud_combined.pdf (last visited Dec. 20, 2024)

[11] Federal Trade Commission, Reports show scammers cashing in on crypto craze (June 3, 2022)
https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2022/06/reports-show-
scammers-cashing-crypto-craze. (last visited Dec. 20, 2024)

rejecting suspicious transactions (such as the four transactions directed by the Plaintiff's scammer, in which a total of $45,800.00 was deposited over the course of five days, two of which occurred at the same ATM within minutes of each other, by a first-time 69 year old user), implementing strict and accurate identification requirements and mechanisms, placing strict limits on the amounts of deposits by new users for an introductory period, placing strict limits on total daily deposits for all users, implementing policies and mechanisms to confirm that the wallet belongs to the depositor, and implementing a reasonable holding period before the cash is converted to bitcoin and "irreversibly" transferred.

35.     Instead of taking effective, responsible measures to eliminate the danger posed by its Bitcoin ATMs, Athena has limited its "efforts" to passive measures that have been ineffective at stopping the regular and foreseeable use of its kiosks to enable scams.

36.     Athena's efforts to address the regular and foreseeable use of its Bitcoin ATMs to enable scams are limited to displaying warnings about such scams at the beginning of each transactions and requiring users to click several check boxes next to disclaimers stating that the user has been warned about scams, that the wallet to be used in the transaction belongs to the user, and similar affirmations.

37.     Such warnings, disclaimers, and checkboxes are predictably ineffective in the context of an impersonation scam, in which the victim is not engaging with the kiosk as a voluntary customer, but rather at the explicit direction of a professional criminal who the victim believes must be obeyed to avert financial disaster.

38.     Notably, the explosion of scams recently reported by the FTC largely occurred *after* Athena implemented its impotent and ineffective warnings, disclaimers, and checkboxes.

39.     Athena is capable of implementing effective and sufficient checks and procedures that would intervene, prevent, mitigate, or deter the use of its Bitcoin ATMs in impersonation, but has chosen not to adopt such measures because doing so would thwart a substantial volume of Athena's business and the considerable profit it gains from every dollar inserted into the machines.

40.     For example, on November 29, 2024, the market value of 1 BTC was approximately $97,004[12], but Athena sold the subject BTC to Plaintiff at a 34% markup, at $130,114 per BTC, resulting in a profit of approximately $6,732.00 for Athena as a result of the Plaintiff's first transaction.

41.     Athena is capable of implementing effective and sufficient checks and procedures both at the Bitcoin ATMs and internally that would intervene, prevent, mitigate, or deter the use of its Bitcoin ATMs in scams such as the one in this case, but knowingly choose not to adopt effective checks or balances because doing so would thwart a substantial volume of their business and the immense profit they gain from every dollar inserted into its ATMs.

## The Bitcoin Scam

42.     Plaintiff, Girma Yilma is a sixty-nine-year-old retiree who lives with his wife in Aurora, Colorado.

43.     Plaintiff was the target and victim of an Athena Bitcoin ATM scam.

44.     In the early morning hours of Thanksgiving day, November 28, 2024, Plaintiff sat down at his computer and was surprised to find that the system shut down aside from an alert from Microsoft with a telephone number.

---

[12] https://www.statista.com/statistics/326707/bitcoin-price-index/ (last visited Dec. 20, 2024).

45.    Plaintiff dialed the telephone number for Microsoft technical assistance and spoke

with an unnamed individual who identified himself as a Microsoft representative. The unknown

representative offered to remotely access Plaintiff's computer to troubleshoot the issue.

46.    Plaintiff, believing that the unknown representative was a legitimate Microsoft

representative, granted remote access to his computer. As the unknown representative searched

Plaintiff's computer, he allegedly discovered "corrupt" files and further indicated that someone

had completed a fraudulent purchase in the amount of $5,000.00 using Plaintiff's Wells Fargo

bank account. The unknown representative then told Plaintiff that because Plaintiff's electronic

devices were contaminated, the unknown representative would contact Wells Fargo Bank on

behalf of the Plaintiff using a 3-way call.

47.    The unknown representative asked Plaintiff to provide the telephone number for

Wells Fargo located on the back of Plaintiff's debit card, which Plaintiff provided. The unknown

representative then dialed telephone number and connected Plaintiff to a Wells Fargo

representative who identified himself as John Miller ("Miller").

48.    Miller confirmed the fraudulent $5,000.00 charge on Plaintiff's account and

instructed Plaintiff not to reveal this information to anyone. Miller then advised Plaintiff that

because Plaintiff was unable to secure his account in person, due to the bank's closure for the

Thanksgiving holiday, Plaintiff should purchase eight (8) apple gift cards in the amount of

$200.00 each, and provide Miller with the account numbers on the back of each card so that

Miller could secure some of Plaintiff's funds. Plaintiff did as he was instructed.

49.    The following day, Miller telephoned Plaintiff and advised him to visit the nearest

Wells Fargo bank branch to withdraw $20,000.00 to further secure Plaintiff's account. Miller

instructed Plaintiff to tell the bank teller, if asked, that the money was needed for home

improvement projects. Again, Plaintiff did as he was instructed.

50.     Miller remained on the line with Plaintiff and continued to provide instructions.

51.     Next, Miller directed Plaintiff to the Foxfield Wine and Spirits ("Foxfield")

located at 16350 E Arapahoe Rd. in Foxfield, Colorado.

52.     Miller sent Plaintiff a bitcoin wallet QR code via text which was titled

"secure.com" and instructed Plaintiff to deposit the $20,000.00 cash into an Athena Bitcoin

ATM which was located inside Foxfield.

53.     Miller further explained that once the cash was deposited, secure.com would

safely maintain Plaintiff's funds until his accounts were restored.

54.     Although Plaintiff had never used a Bitcoin ATM before, Miller remained on the

line with Plaintiff to give him step by step instructions.

55.     The deposit of $19,800.00 was exchanged for 0.15217410 of a bitcoin at a sales

rate of $130,114.13 (approximately $33,000.00 more than closing price for Bitcoin at that time

of day) which Athena deposited into the scammer's bitcoin wallet. *See* **Exhibit 1**, Athena

Deposit Receipt 11/29/2024.

56.     On December 2, 2024 Miller telephoned Plaintiff again to alert him that he

discovered Plaintiff was the victim of identity theft. Miller inquired whether Plaintiff had

additional bank accounts separate and aside from the Wells Fargo checking account and

explained that any additional accounts would also be at risk. Plaintiff revealed to Miller that he

also had a checking account with Bellco Credit Union ("Bellco").

57.     Miller advised Plaintiff to visit the nearest branch to withdraw the contents of Plaintiff's Bellco account. Plaintiff withdrew $5,000.00 from one branch, and an additional $15,000.00 from another branch.

58.     At this point, Plaintiff became suspicious and asked to speak to someone in person about his exposed accounts. Miller advised Plaintiff that they wouldn't be able to send someone out until Wednesday, and by then, it might be too late. Plaintiff was terrified at the thought that someone might be using his identity to make fraudulent purchases so he agreed to proceed.

59.     This time, Miller directed Plaintiff to a Big D convenience store located at 3400 N Colorado Blvd., Denver, CO 80205 which housed another Athena Bitcoin ATM.

60.     At the ATM, Plaintiff was instructed to make separate deposits. The first deposit of $5,000.00 was exchanged for 0.03883402 of a bitcoin at a sales rate of $128,743.10 (approximately $33,000.00 more than closing price for Bitcoin at that time of day)[13] which Athena deposited into the scammer's bitcoin wallet. *See* **Exhibit 2**, Athena Deposit Receipt No. 1 12/2/2024.

61.     The second deposit of $15,000.00 was exchanged for 0.11696390 of a bitcoin at a sales rate of $128,244.70 (approximately $31,000.00 more than the closing price for Bitcoin at that time of day)[14] which Athena deposited into the scammer's bitcoin wallet. *See* **Exhibit 3**, Athena Deposit Receipt No. 2 12/2/2024.

62.     On December 3, 2024, the Microsoft representative contacted Plaintiff and told him it was necessary to scan Plaintiff's computer again as there appeared to be numerous issues.

---

[13] https://www.statmuse.com/money/ask/bitcoin-price-october-7th-2024 (last visited Nov. 19, 2024)
[14] *Id.*

63.     Once again, the scammers were successful in directing Plaintiff to the Foxfield to deposit another $6,000.00 into the Athena Bitcoin ATM.

64.     This deposit was exchanged for 0.04702307 of a bitcoin at a sales rate of $127,596.93 (approximately $30,000.00 more than the closing price for Bitcoin at that time of day) which Athena deposited into the scammer's bitcoin wallet. *See* **Exhibit 4**, Athena Deposit Receipt 12/3/2024.

65.     Despite the scammers' instructions not to tell anyone, Plaintiff decided to tell his daughter what had transpired over the last few days.

66.     Plaintiff, along with the assistance and encouragement of his daughter, filed a police report for fraud with the Aurora Police Department. *See* **Exhibit 5**, Police Report.

67.     Plaintiff also filed fraud disputes with both Wells Fargo and Bellco Credit Union.

68.     The Defendants are capable of implementing effective and sufficient checks and procedures both at the Bitcoin ATMs and internally that would intervene, prevent, mitigate, or deter the use of the Bitcoin ATMs in scams such as the one in this case, but knowingly choose not to adopt effective checks or balances because doing so would thwart a substantial volume of their business and the immense profit they gain from every dollar inserted into the Athena Bitcoin ATM.

### Athena's Continued Possession and Failure to Return the Cash to the Plaintiff after Learning it was Stolen

69.     After the stolen cash totaling $45,800.00 was deposited into Athena's Bitcoin ATMs on November 28, 2024, December 2, 2024, and December 3, 2024, Athena retained possession of the cash and converted it to its own use, rather than turning it over to the police or Plaintiff.

70.    Athena has retained and failed to return the stolen cash to Plaintiff despite having been notified that the cash was stolen property, and that the Plaintiff had deposited into Athena's Bitcoin ATMs under a mistake as to the identity of the recipient.

71.    Athena has retained possession of the stolen cash harvested from its machines rather than returning it to the victims, based on its position, stated in the written warnings given at its Bitcoin ATMs that all cash deposited into the machines are "irreversibly" transferred as Bitcoin to the designated wallet.

72.    Athena's statements that cash deposits at its Bitcoin ATMs are "irreversible" is misleading, as the cash itself remains physically inside the kiosk, and thus in Athena's possession and control.

73.    Athena's misrepresentation that the stolen cash was "irreversibly transferred" is particularly apparent with respect to the substantial portion of the stolen cash retained by Athena as a fee for its "services" and thus necessarily not transferred to the scammer.

74.    In the Plaintiff's case, Athena's profit from the theft was approximately $15,382.00 (about 34%) of the $45,800.00 stolen from the Plaintiff.

75.    Athena therefore did not transfer to the scammer, irreversibly or otherwise, $15,382.00, and so has retained and converted that portion of the stolen property, without any proffered explanation or excuse.

## CLASS ACTION ALLEGATIONS

76.    Plaintiff brings this action pursuant to the provisions of Col. R. Civ. P. 23(a) and (b), and (b)(1), (b)(2) and (b)(3)of the Federal Rules of Civil Procedure, on behalf of herself and the following Class:

All persons over the age of 60 residing in the State of Colorado who were victims of a financial scam involving an Athena Bitcoin ATM and whose stolen cash was not

subsequently recovered or returned to them by Athena Bitcoin, Inc. or any other party.

77.    Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to its departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as its immediate family members.

78.    Plaintiff reserves the right to amend the above definitions or to propose subclasses in subsequent pleadings and motions for class certification.

79.    This action has been brought and may properly be maintained as a class action under Col. R. Civ. P. 23 because there is a well-defined community of interest in the litigation, and membership in the proposed classes is easily ascertainable.

80.    Numerosity: A class action is the only available method for the fair and efficient adjudication of this controversy, as the members of the Class (which Plaintiff is informed and believes, and on that basis, alleges that the total number of persons is in the hundreds and can be determined by analysis of Defendant's records) are so numerous that joinder of all members is impractical, if not impossible.

81.    Commonality: Plaintiff and Class Members share a community of interests in that there are numerous common questions and issues of fact and law which predominate over any questions and issues solely affecting individual members, including, but not necessarily limited to:

a.  Whether Defendants had a legal duty to Plaintiff and the Class to exercise due
    care to intervene, prevent, mitigate, and/or deter the use of Athena Bitcoin ATMs
    in financial scams;

b.  Whether Defendants knew or should have known of the susceptibility of Plaintiff
    and Class Members in financial scams involving Athena Bitcoin ATMs;

c.  Whether Defendants' security procedures and practices to intervene, prevent,
    mitigate, and/or deter financial scams involving its Athena Bitcoin ATMs were
    reasonable in light of the industry standard;

d.  Whether Defendant failed to comply with its own policies and applicable laws,
    regulations, and industry standards relating to the intervention, prevention,
    mitigation, and/or deterrence of financial scams involving its Athena Bitcoin
    ATMs;

e.  Whether Defendants have knowledge that its Athena Bitcoin ATMs are used by
    criminals to engage in transactions for illegal goods and services, including drug
    sales and trafficking, human trafficking, and prostitution;

f.  Whether Defendants failed to design and manufacture its Athena Bitcoin ATMs
    to deter the victimization of its users;

g.  Whether Defendants failed to design and manufacture its Athena Bitcoin ATMs
    to prevent the victimization of its users;

h.  Whether Defendants' conduct, including its failure to act, resulted in or was the
    proximate cause of Plaintiff's and Class Members' injuries;

     i.   Whether Plaintiff and Class Members are entitled to actual and/or statutory

damages and/or whether injunctive, corrective and/or declaratory relief and/or

accounting is/are appropriate as a result of Defendants' wrongful conduct; and

     j.   Whether Plaintiff and Class Members are entitled to restitution as a result of

Defendants' wrongful conduct.

82.    Typicality: Plaintiff's claims are typical of the claims of the Class. Plaintiff and

all members of the Class sustained damages arising out of and caused by Defendant's common

course of conduct in violation of law, as alleged herein.

83.    Adequacy of Representation: Plaintiff is an adequate representative of the Class in

that the Plaintiff has the same interest in the litigation of this case as the Class Members, is

committed to the vigorous prosecution of this case, and has retained competent counsel who are

experienced in conducting litigation of this nature.

84.    Plaintiff is not subject to any individual defenses unique from those conceivably

applicable to other Class Members or the class in its entirety. Plaintiff anticipates no

management difficulties in this litigation.

85.    Superiority of Class Action: Since the damages suffered by individual Class

Members, while not inconsequential, may be relatively small, the expense and burden of

individual litigation by each member make or may make it impractical for members of the Class

to seek redress individually for the wrongful conduct alleged herein. Should separate actions be

brought or be required to be brought by each individual member of the Class, the resulting

multiplicity of lawsuits would cause undue hardship and expense for the Court and the litigants.

86.    The prosecution of separate actions would also create a risk of inconsistent

rulings, which might be dispositive of the interests of the Class Members who are not parties to

the adjudications and/or may substantially impede their ability to protect their interests
adequately.

87.     This class action is also appropriate for certification because Defendant has acted
or refused to act on grounds generally applicable to Class Members, thereby requiring the
Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class
Members and making final injunctive relief appropriate with respect to the Class in its entirety.

88.     Defendant's policies and practices challenged herein apply to and affect Class
Members uniformly and Plaintiff's challenge of these policies and practices hinges on
Defendant's conduct with respect to the Class in its entirety, not on facts or law applicable only
to Plaintiff.

89.     Unless a Class-wide injunction is issued, Defendants may continue failing to
properly take measures to protect vulnerable persons who fall victim to financial scams
involving Defendants' ATMs, and Defendant may continue to act unlawfully as set forth in this
Complaint.

90.     Further, Defendant has acted or refused to act on grounds generally applicable to
the Classes and, accordingly, final injunctive or corresponding declaratory relief with regard to
the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil
Procedure.

### COUNT ONE: CIVIL THEFT FOR POSSESSION OF STOLEN PROPERTY
#### (Against Athena)
#### *On behalf of Plaintiff*

91.     Plaintiff alleges and incorporates herein every allegation set forth in the preceding
paragraphs as though the same were fully rewritten herein.

92.    Colo. Rev. Stat. § 18-4-405 (2017) provides that a person who has sustained

damages resulting from theft may recover three times the amount of the actual damages

sustained by him, and reasonable attorney's fees and costs.

93.    To state a claim for civil theft, a plaintiff must allege the elements of criminal

theft: that the defendant "'knowingly obtains, retains, or exercises control over anything of value

of another without authorization or by threat or deception,' and acts intentionally or knowingly in

ways that deprive the other person of the property permanently." C. R. S. § 18-4-401(1) (2017).

94.    Plaintiff was the rightful owner of the funds he withdrew from his bank accounts,

which were then stolen through fraud and converted into Bitcoin by third-party scammers using

Athena's Bitcoin ATM. The theft was perpetrated by a scheme in which Plaintiff was wrongfully

induced to deposit his funds into Athena Bitcoin ATMs, believing that doing so would prevent

some financial calamity concocted by the scammer.

95.    Athena directly benefited from the theft by charging a substantial markup from

the transactions in which Plaintiff's stolen funds were converted into Bitcoin. For example, on

November 29, 2024, the market value of 1 BTC was approximately $97,004, but Athena sold the

subject BTC to Plaintiff at a 34% markup, at $130,114 per BTC, resulting in a profit of

approximately $6,732.00 for Athena as a result of the Plaintiff's first transaction. Similarly,

Athena profited approximately $1,750.00 from Plaintiff's second transaction, $4,800.00 from

Plaintiff's third transaction, and an additional $2,100.00 from Plaintiff's fourth and final

transaction.

96.    Athena was made expressly aware that the Athena Bitcoin ATM transactions

involving Plaintiff was the result of a fraudulent scam, however, Athena failed to refund Plaintiff

any and all fees Defendant collected from the fraudulent transactions.

97.    As a direct and proximate result of Athena's actions and omissions, Plaintiff
suffered financial harm, by which his funds were wrongfully stolen without Plaintiff's consent.

98.    Despite Plaintiff's efforts to recover the funds and despite Athena's knowledge of
the fraud, Athena has refused or failed to return Plaintiff's funds or to take any action to reverse
the fraudulent transaction.

99.    Athena knowingly received the proceeds of Plaintiff's stolen funds by converting
the cash into Bitcoin through its Bitcoin ATM and retaining the significant markup and other
fees on the transaction. The funds were stolen property, and Athena's retention of its profits from
the scam constitutes the receipt of stolen property.

100.    Athena's failure to take steps to prevent such scams, despite clear knowledge that
its Bitcoin ATMs are exploited by criminals, demonstrates willful and intentional disregard for
its customers, including Plaintiff. Athena profited from the stolen funds, which it knew or should
have known were the result of illegal activity.

## COUNT TWO: VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT ("CCPA")
### Colo. Rev. Stat. §§ 6-1-101, et seq.
### (Against All Defendants)
### *On Behalf of Plaintiff and the Class*

101.    Plaintiff alleges and incorporates herein every allegation set forth in the preceding
paragraphs as though the same were fully rewritten herein.

102.    The CCPA creates a cause of action for individuals who, in the course of a
Defendant's business or occupation, was injured as a result of a deceptive trade practice. C.R.S.
§ 6-1-113(1)(c).

103.    The CCPA provides a non-exhaustive list of deceptive trade practices in section

6-1-105 which includes, but is not limited to, recklessly making a false representation as to the

characteristics, uses, and benefits of a service.

104.    Each of the Defendants are "persons" as defined by C.R.S. § 6-1-102(6).

105.    The Defendants engaged in deceptive practices by (1) failing to implement

policies and operational safeguards to prevent Athena Bitcoin ATMs from continuing to serve as

instrumentalities for fraudulent schemes to steal money from seniors and other vulnerable

victims; and, (2) retaining possession of the stolen cash harvested from Athena Bitcoin ATMs

rather than returning it to the victims, based on the misrepresentation that the cash had been

"irreversibly" exchanged for Bitcoin and transferred to the scammers' untraceable wallet.

106.    The Defendants are expressly aware that Athena Bitcoin ATMs are used as

vehicles by scammers to defraud the elderly and vulnerable both in the State of Colorado and

elsewhere. In fact, Athena itself has openly acknowledged since at least 2018 that its Bitcoin

ATM kiosks not only pose a high risk of use as instrumentalities for impersonation scams, but in

fact have been regularly used for such crimes.

107.    Notwithstanding this fact, the Defendants have taken insufficient steps to prevent,

intervene, or mitigate those instances in which Athena Bitcoin ATMs are used by scammers,

because the Defendants derive a substantial revenue from the use of Athena Bitcoin ATMs.

108.    Athena  could easily implement additional or different protocols or procedures to

prevent its Bitcoin ATMs from being used by scammers. For example, by detecting and rejecting

suspicious transactions, implementing strict and accurate identification requirements and

mechanisms, placing strict limits on the amounts of deposits by new users for an introductory

period, placing strict limits on total daily deposits for all users, implementing policies and

mechanisms to confirm that the wallet belongs to the depositor, and implementing a reasonable
holding period before the cash is converted to bitcoin and "irreversibly" transferred.

109.    Instead, Athena's efforts to address the regular and foreseeable use of its Bitcoin
ATMs to enable scams have been limited to displaying warnings about such scams at the
beginning of each transactions and requiring users to click several check boxes next to
disclaimers stating that the user has been warned about scams, that the wallet to be used in the
transaction belongs to the user, and similar affirmations.

110.    Such warnings, disclaimers, and checkboxes are predictably ineffective in the
context of an impersonation scam, in which the victim is not engaging with the kiosk as a
voluntary customer, but rather at the explicit direction of a professional criminal who the victim
believes must be obeyed to avert financial disaster

111.    Furthermore, Foxfield and Big D (the "Store Defendants"), intentionally choose
not to implement protocols to warn ATM users because doing so would thwart continued use of
the Athena Bitcoin ATMs by scammers, and the Store Defendants would not collect the
substantial revenue it derives from their relationship with Athena.

112.    Plaintiff and Class Members have suffered substantial monetary losses as a direct
result of the Defendants intentionally and knowingly failing to take appropriate steps to prevent,
intervene, or mitigate instances in which persons are victimized by scams perpetrated through
Athena Bitcoin ATMs in the State of Colorado and elsewhere and by misrepresenting to Plaintiff
and Class Members that a refund of any kind is not possible.

113.    As a result of the Defendants' violation of the CCPA, Defendants are liable to the
Plaintiff and Class Members for actual damages, and reasonable attorney's fees and costs.

## COUNT THREE: UNJUST ENRICHMENT
### (Against All Defendants)

*On behalf of Plaintiff and the Class*

114.    Plaintiff alleges and incorporates herein every allegation set forth in the preceding paragraphs as though the same were fully rewritten herein.

115.    Athena is engaged in the business of placing and remotely operating cryptocurrency ATMs through which they sell fractional shares of the cryptocurrency Bitcoin.

116.    Plaintiff and Class Members were directed to make cash deposits into Athena Bitcoin ATMs by an unknown scammer under the guise that doing so would prevent some legal or financial calamity concocted by the scammer.

117.    With each cash deposit made by Plaintiff and Class Members at an Athena Bitcoin ATM, Athena converted the cash to Bitcoin cryptocurrency, and credited the BTC value to an untraceable online account called a "wallet."

118.    Athena gains a considerable profit from every dollar inserted into its Bitcoin ATMs by charging a fee per BTC equal to the prevailing price at U.S. crypto-based exchanges plus a substantial markup. For example, on November 29, 2024, the market value of 1 BTC was approximately $97,004, but Athena sold the subject BTC to Plaintiff at a 34% markup, at $130,114 per BTC, resulting in a profit of approximately $6,732.00 for Athena as a result of the Plaintiff's first transaction. Similarly, Athena profited approximately $1,750.00 from Plaintiff's second transaction, $4,800.00 from Plaintiff's third transaction, and an additional $2,100.00 from Plaintiff's fourth and final transaction.

119.    Furthermore, the Store Defendants profit from the use of Athena Bitcoin ATMs in its stores by receiving a monthly lease amount from Athena for housing its ATM and other fees.

120.    Once the stolen cash is deposited into Athena's Bitcoin ATMs, Defendants retain

possession of the stolen cash and convert it to its own use, rather than turning it over to the police

or Plaintiff and Class Members.

121.    Defendants are fully aware that Athena Bitcoin ATMs not only pose a high risk of

use as instrumentalities for impersonation scams, but in fact have been regularly used for such

crimes. In fact, Athena has publicly acknowledged in its blog "Avoid These Bitcoin Scams" that

scammers frequently instruct their victims to use Athena Bitcoin ATMs to purchase Bitcoin as

part of fraudulent schemes.

122.    Despite this knowledge, Defendants have failed to implement sufficient

safeguards to protect consumers like Plaintiff and Class Members from fraud. Instead,

Defendants continue to profit from such transactions, unjustly enriching themselves at the

expense of victims of scams.

123.    Under the circumstances, it would be unjust and against equity and good

conscience for Defendants to retain the ill-gotten benefits without restitution to Plaintiff and

Class Members for the money that was stolen from them, and disgorgement of the profits

obtained by Defendants that are lawfully the proceeds of Plaintiff and Class Members is

appropriate.

### COUNT FOUR: NEGLIGENCE
#### (Against Athena)
*On behalf of Plaintiff and the Class*

124.    Plaintiff alleges and incorporates herein every allegation set forth in the preceding

paragraphs as though the same were fully rewritten herein.

125.    Athena is expressly aware of the risk of financial abuse and has made affirmations

to the public and its customers that it "ensures safe and secure banking [...]". Accordingly,

Athena has assumed a duty to Plaintiff and the Class to take reasonable steps to prevent the financial exploitation of elderly adults taking part in whole or in part at its Bitcoin ATMs.

126.    As a financial services company, Athena also owed a statutory duty to be aware of Plaintiff's and Class Members' status, age, and risk of being victimized under the "Know Your Customer" Rule under the Patriot Act and, if it did so, would have recognized that Plaintiff and Class Members were vulnerable persons.

127.    Plaintiff and Class Members, as senior citizens, are well-recognized within the cryptocurrency industry as a target for elder financial abuse, even according to Athena's own website that displays a telephone number for the AARP's fraud watch helpline.[15]

128.    The transactions at issue in this case were atypical and suggestive of a scam, and should have triggered an alert with Athena, because they involved a sixty-nine-year-old man making four separate deposits totaling $45,800.00 over the course of five days, three of which occurred at the same Athena Bitcoin ATM, into a bitcoin wallet that belonged to someone else.

129.    Athena breached its duties to Plaintiff and the Class by negligently, recklessly, and knowingly failing to implement checks and procedures both at its ATMs and internally that would effectively intervene, mitigate, or deter the use of its ATMs in scams such as the one in this case.

130.    Athena, through its actions and failure to act, negligently, grossly negligently, and recklessly participated in and materially aided in the financial exploitation of Plaintiff and Class Members. Without Athena's actions and failures, such exploitation would not have occurred.

131.    Athena's negligent, reckless, and knowing failure and refusal to implement appropriate and sufficient checks and procedures to intervene, mitigate, or deter the use of the

---

[15] https://athenabitcoin.com/avoid-these-bitcoin-scams/ (last visited Jan. 2, 2025).

ATMs described above in the subject scam was a direct and proximate cause of Plaintiff and

Class Members being scammed out of thousands of dollars (in Plaintiff's case, $45,800), while

Athena gained a profit as a direct result of the scam being committed.

### COUNT FIVE: NEGLIGENT DESIGN
#### (Against Athena)
#### *On Behalf of Plaintiff and the Class*

132.    Plaintiff alleges and incorporates herein every allegation set forth in the preceding

paragraphs as though the same were fully rewritten herein.

133.    Bitcoin ATMs are publicly accessible kiosks for converting cash to BTC

cryptocurrency, which is credited to an untraceable online account called a "wallet." The kiosks

resemble ordinary ATMs and typically feature a touchscreen for display and input of

information, a bill acceptor slot, and a scanning device for the user to input a QR code associated

with the "wallet."

134.    Athena is engaged in the business of placing and remotely operating

cryptocurrency ATMs through which they sell fractional shares of the cryptocurrency Bitcoin.

135.    Each of Athena's Bitcoin ATMs is connected to the Internet and employs its own

developed software, Exodus, to manage and administer the ATMs.

136.    Athena has designed its software to facilitate transactions at their kiosks to be

immediate, untraceable, and irreversible.

137.    Because of their ubiquity and obvious suitability for illicit cash transfers, Athena

Bitcoin ATMs  have become the instrumentality of choice for perpetrators of "impersonation

scams," in which organized, sophisticated criminals pose as government, law enforcement,

corporate technical support personnel and similar authority figures, and convince their victims

(in most cases, seniors with retirement assets, like the Plaintiff) to withdraw large amounts of

cash from their bank accounts and deposit it into specified Bitcoin ATMs using a provided QR code, typically to prevent some legal or financial calamity concocted by the scammer.

138.    Athena itself has acknowledged on its website that its Bitcoin ATMs have been foreseeably and regularly used for impersonation scams. Despite having knowledge that its ATMs are exploited by criminals to facilitate illegal activity, Athena has failed to implement policies and operational safeguards to prevent its Bitcoin ATMs from continuing to serve as instrumentalities for these crimes.

139.    Athena has the ability to design safer software at its ATMs that could detect and reject suspicious transactions (such as the four transactions directed by the Plaintiff's scammer, in which a total of $45,800.00 was deposited over the course of five days, two of which occurred at the same ATM within minutes of each other, by a first-time 69 year old user), implement strict and accurate identification requirements and mechanisms, place strict limits on the amounts of deposits by new users for an introductory period, place strict limits on total daily deposits for all users, implement policies and mechanisms to confirm that the wallet belongs to the depositor, and implement a reasonable holding period before the cash is converted to bitcoin and "irreversibly" transferred.

140.    Traditional ATMs are designed with key safety features, such as cash withdrawal limits, counterfeit detection technology, image recognition, authentication and data integrity, 24×7 transaction monitoring and fraud prevention, etc.

141.    Athena is capable of implementing effective and sufficient checks and procedures both at its Bitcoin ATMs and internally that would intervene, prevent, mitigate, or deter the use of its Bitcoin ATMs in scams such as the one in this case, but knowingly choose not to adopt

effective checks or balances because doing so would thwart a substantial volume of their
business and the immense profit they gain from every dollar inserted into its Bitcoin ATM.

142.    Instead of taking effective, responsible measures to eliminate the danger posed by
its Bitcoin ATMs, Athena has limited its "efforts" to passive measures that have been ineffective
at stopping the regular and foreseeable use of its kiosks to enable scams.

143.    Athena's efforts to address the regular and foreseeable use of its Bitcoin ATMs to
enable scams are limited to displaying warnings about such scams at the beginning of each
transactions and requiring users to click several check boxes next to disclaimers stating that the
user has been warned about scams, that the wallet to be used in the transaction belongs to the
user, and similar affirmations.

144.    Such warnings, disclaimers, and checkboxes are predictably ineffective in the
context of an impersonation scam, in which the victim is not engaging with the kiosk as a
voluntary customer, but rather at the explicit direction of a professional criminal who the victim
believes must be obeyed to avert financial disaster.

145.    Had Athena designed its ATM software to place strict limits on the amounts of
deposits by new users for an introductory period, place strict limits on total daily deposits for all
users, or even implement a reasonable holding period before the cash is converted to bitcoin and
"irreversibly" transferred, Plaintiff and Class Members would not have lost thousands of dollars
in fraudulent scams.

146.    As a direct and proximate result of Athena's placing a defective and unreasonably
dangerous product into the stream of commerce, Plaintiff and Class Members have suffered
damage to their property in the form of loss of title to cash assets deposited into the machines
and severe mental distress.

## COUNT SIX: NEGLIGENCE
### (Against the Store Defendants)
*On Behalf of Plaintiff*

147.    Plaintiff alleges and incorporates herein every allegation set forth in the preceding

paragraphs as though the same were fully rewritten herein.

148.    Each of the Store Defendants own and maintain control over their respective retail

stores at which the Athena Bitcoin ATMs used in Plaintiff's case are located.

149.    The Store Defendants profit from the use of Athena Bitcoin ATMs in its stores by

receiving a monthly lease amount from Athena for housing its ATMs and other fees.

150.    Plaintiff entered the retail stores at the implied invitation of the Store Defendants

who hold its stores open to customers, such as the Plaintiff. As such, Plaintiff is considered an

invitee under the law.

151.    Because Plaintiff is considered an invitee, the Store Defendants owed Plaintiff a

duty to warn Plaintiff of known hazards and prevent foreseeable risks of which the Store

Defendant had or should have had knowledge.

152.    The Store Defendants had actual knowledge that the Athena Bitcoin ATMs

located on its property are commonly used to perpetuate cryptocurrency scams, including against

elderly persons such as Plaintiff.

153.    It is not obvious upon viewing the Athena Bitcoin ATMs that they are often used

to perpetuate cryptocurrency scams, including scams against elderly persons such as Plaintiff.

154.    Plaintiff was in fact the victim of a cryptocurrency scam facilitated by Athena

Bitcoin ATMs located in the Store Defendants' retail stores.

155.    As a direct and proximate result of the Store Defendants' failure to take

reasonable steps to warn Plaintiff that the Athena Bitcoin ATMs are often used to perpetuate

cryptocurrency scams, Plaintiff fell victim to a cryptocurrency scam at the Store Defendants' retail stores, and sustained damages as a result.

156.    The Store Defendants are liable to Plaintiff for his damages proximately resulting from the Store Defendants' failure to take reasonable steps to warn Plaintiff that the Athena Bitcoin ATMs are often used to perpetuate cryptocurrency scams.

157.    The Store Defendants' failure to warn Plaintiff of this known hazard at its stores, and its failure to prevent the foreseeable risk that Plaintiff would lose thousands of dollars in a cryptocurrency scam facilitated by the Athena Bitcoin ATM was a result of intentional and purposeful acts by the Store Defendants failure to implement policies and procedures to warn its customers of this hazard. The Store Defendants were not merely negligent in its failure to warn, but consciously made the decision not to warn its customers of this hazard.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff Girma Yilma, on behalf of himself and each member of the proposed Class, respectfully requests the following relief from Defendants, Athena Bitcoin, Inc., Foxfield Wine & Spirits, LLC, and Big D Oil Co., jointly and severally:

A. That the Court declare, adjudge, and decree that this action is a proper class action and certify the proposed class and/or any other appropriate subclasses under F.R.C.P. Rule 23 (b)(1), (b)(2), and/or (b)(3), including the appointment of Plaintiff's counsel as Class Counsel;

B. For an award of damages, including actual, nominal, consequential, and punitive damages, as allowed by law in an amount to be determined;

C. That the Court enjoin Defendants, ordering them to cease from unlawful activities;

D.  For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other
equitable relief as is necessary to protect the interests of Plaintiff and Class Members,
including but not limited to an Order:

   a.  prohibiting Defendants from engaging in the wrongful and unlawful acts described
herein; and

   b.  requiring Defendants to implement and maintain measures to intervene, prevent,
mitigate, and/or deter financial scams involving its ATMs to protect Plaintiff and
Class Members.

E.  For prejudgment interest on all amounts awarded, at the prevailing legal rate;

F.  For an award of all of Plaintiff's reasonable attorneys' fees and costs against the
Defendants for the allegations contained in all Counts of the Complaint; and

G.  For all other relief this Court deems just and proper.

Respectfully Submitted,

/s/ Allen R. Jones III
Allen R. Jones III (CO #59350)
Resolve Law Group
885 Arapahoe Ave.
Boulder, CO 80302
(720) 800-8338
allen@resolvelawgroup.com

Brian D. Flick (OH #0081605)*
Marita I. Ramirez (OH #0101882)*
DannLaw
15000 Madison Avenue
Lakewood, OH 44107
(216) 373-0539
(216) 373-0536 e-fax
notices@dannlaw.com
*Pro Hac Vice Application Anticipated
Attorneys for Plaintiff Girma Yilma and the putative
class

## JURY DEMAND

Plaintiff, Girma Yilma, hereby respectfully demands a trial by jury on all such claims that may be so tried.

/s/ Allen R. Jones III
Allen R. Jones III (CO #59350)
Resolve Law Group
885 Arapahoe Ave.
Boulder, CO 80302
(720) 800-8338
allen@resolvelawgroup.com

Brian D. Flick (OH #0081605)*
Marita I. Ramirez (OH #0101882)*
DannLaw
15000 Madison Avenue
Lakewood, OH 44107
(216) 373-0539
(216) 373-0536 e-fax
notices@dannlaw.com

*Pro Hac Vice Application Anticipated*

*Attorneys for Plaintiff Girma Yilma and the putative class*

# EXHIBIT B

☐ **FORM 1.2. DISTRICT COURT CIVIL (CV) CASE COVER SHEET FOR INITIAL PLEADING OF COMPLAINT, COUNTERCLAIM, CROSS-CLAIM OR THIRD PARTY COMPLAINT AND JURY DEMAND**       DATE FILED
                                                                          January 17, 2025 5:19 PM
                                                                          FILING ID: 154DA92DFD91B
                                                                          CASE NUMBER: 2025CV30147

| | |
|---|---|
| District Court Arapahoe _____ County, Colorado<br>Court Address: 7325 S. Potomac Street Centennial, Colorado 80112 | |
| Plaintiff(s): GIRMA YILMA, et al.<br>v.<br>Defendant(s): ATHENA BITCOIN, INC., et al. | ▲ COURT USE ONLY ▲ |
| Attorney or Party Without Attorney (Name and Address):<br>Allen R. Jones III / Resolve Law Group<br>885 Arapahoe Ave., Boulder, CO 80302<br>Phone Number: (720) 800-8338          E-mail: allen@resolvelawgroup.com<br>FAX Number:                     Atty. Reg. #: 59350 | Case Number: |

| DISTRICT COURT CIVIL (CV) CASE COVER SHEET FOR INITIAL PLEADING OF COMPLAINT,<br>COUNTERCLAIM, CROSS-CLAIM OR THIRD PARTY COMPLAINT<br>AND JURY DEMAND |
|---|

1. This cover sheet shall be filed with the initial pleading of a complaint, counterclaim, cross-claim or third party complaint in every district court civil (CV) case. It shall not be filed in Domestic Relations (DR), Probate (PR),, Juvenile (JA, JR, JD, JV), or Mental Health (MH) cases or in Water (CW) proceedings subject to sections 37-92-302 to 37-92-305, C.R.S. Failure to file this cover sheet is not a jurisdictional defect in the pleading but may result in a clerk's show cause order requiring its filing.

2. Simplified Procedure under C.R.C.P. 16.1 **applies** to this case **unless** (check one box below if this party asserts that C.R.C.P. 16.1 **does not** apply):

   ☒ This is a class action, forcible entry and detainer, Rule 106, Rule 120, or other similar expedited proceeding, **or**

   ☐ This party is seeking a monetary judgment against another party of more than $100,000.00, exclusive of interest and costs, as supported by the following certification:

      By my signature below and in compliance with C.R.C.P. 11, based upon information reasonably available to me at this time, I certify that the value of this party's claims against one of the other parties is reasonably believed to exceed $100,000.

   **Or**

    ☐ Another party has previously filed a cover sheet stating that C.R.C.P. 16.1 does not apply
to this case.

3.  ☐ This party makes a **Jury Demand** at this time and pays the requisite fee. *See* C.R.C.P. 38.
(Checking this box is optional.)

**Date:** _____

                        _____

                        **Signature of Party**

**Date:** _____01/17/2025_____

                        *Allen R. Jones* ✓✓✓

                        **Signature of Attorney for Party (if any)**_____

**NOTICE**
This cover sheet must be served on all other parties along with the initial pleading of a
complaint, counterclaim, cross-claim, or third party complaint.

# EXHIBIT C

| | |
|---|---|
| District Court, Arapahoe County, Colorado<br>Court Address: 7325 S. Potomac Street<br>         Centennial, Colorado 80112 | |
| Plaintiffs:<br>**GIRMA YILMA**, on behalf of himself and all others similarly<br>situated, | DATE FILED<br>January 21, 2025 1:17 PM<br>FILING ID: 3E229E89816F4<br>CASE NUMBER: 2025CV30147<br><br>▲   **COURT USE ONLY**   ▲ |
| v. | Case Number: |
| Defendants:<br>**ATHENA BITCOIN, INC.**<br>℅ Incorp. Services, Inc., Registered Agent<br>131 Continental Drive, Suite 301<br>Newark, DE 19713<br><br>**FOXFIELD WINE & SPIRITS, LLC**<br>℅ Ragu Dhaurali, Registered Agent<br>16350 E Arapahoe Rd Unit 102<br>Aurora, CO, 80016<br><br>**BIG D OIL CO.**<br>℅ Gunderson Palmer Registered Agents LLC, Registered Agent<br>PO BOX 8045<br>Rapid City, SD 57709 | Division:        Courtroom: |
| **DISTRICT COURT CIVIL SUMMONS** | |

**TO THE ABOVE NAMED DEFENDANTS: ATHENA BITCOIN, INC.** ℅ Incorp. Services, Inc., Registered Agent, **FOXFIELD WINE & SPIRITS, LLC** ℅ Ragu Dhaurali, Registered Agent, **BIG D OIL CO.** ℅ Gunderson Palmer Registered Agents LLC, Registered Agent;

**YOU ARE HEREBY SUMMONED** and required to file with the Clerk of this Court an answer or other response to the attached Complaint. If service of the Summons and Complaint was made upon you within the State of Colorado, you are required to file your answer or other response within 21 days after such service upon you. If service of the Summons and Complaint was made upon you outside of the State of Colorado, you are required to file your answer or other response within 35 days after such service upon you. Your answer or counterclaim must be accompanied with the applicable filing fee.

If you fail to file your answer or other response to the Complaint in writing within the applicable time period, the Court may enter judgment by default against you for the relief demanded in the Complaint without further notice.

Dated:  January 21, 2025

Clerk of Court/Clerk

_/s/ Allen R. Jones III_

Signature of Plaintiff

885 Arapahoe Ave.

Address of Plaintiff

JDF 600  R10-13   DISTRICT COURT CIVIL SUMMONS

Boulder, CO 80304

(720) 800-8338

Plaintiff's Phone Number

**This Summons is issued pursuant to Rule 4, C.R.C.P., as amended. A copy of the Complaint must be served with this Summons. This form should not be used where service by publication is desired.**

**WARNING:** A valid summons may be issued by a lawyer and it need not contain a court case number, the signature of a court officer, or a court seal. The plaintiff has 14 days from the date this summons was served on you to file the case with the court. You are responsible for contacting the court to find out whether the case has been filed and obtain the case number. If the plaintiff files the case within this time, then you must respond as explained in this summons. If the plaintiff files more than 14 days after the date the summons was served on you, the case may be dismissed upon motion and you may be entitled to seek attorney's fees from the plaintiff.

TO THE CLERK: If the summons is issued by the clerk of the court, the signature block for the clerk or deputy should be provided by stamp, or typewriter, in the space to the left of the attorney's name.

JDF 600   R10-13    DISTRICT COURT CIVIL SUMMONS